Willie WILLIAMS, etc., Plaintiffs,

v.

Michael LANE, et al., Defendants.

No. 81 C 355.

United States District Court,
N.D. Illinois, E.D.

Oct. 21, 1986.

Jack A. Rovner, Robert E. Shapiro, Wendi Sloane Weitman, Jeffrey N. Given, Kirkland & Ellis, Chicago, Ill., for plaintiffs.

Michael Hogan, John Andrew Ward, Robert W. Cushing, Asst. Attys. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court conducted an extended trial in this action January 28 through February 10, 1986 (the "Trial"). Following the Trial (but after a considerable delay occasioned by the need to obtain the final Trial transcript) the parties tendered their respective versions of proposed findings of fact ("Findings") and conclusions of law ("Conclusions"). After full consideration, in accordance with Fed.R.Civ.P. ("Rule") 52(a) this Court sets forth the following Findings and Conclusions,[1] which will constitute the grounds for the contemplated Order referred to at the conclusion of this memorandum opinion.[2]

1. To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

2. This memorandum opinion and order employs abbreviations for a number of terms: the

## Findings of Fact

### I. Background

#### A. Claims

1. This action has been brought under 42 U.S.C. § 1983 ("Section 1983") and state law. Plaintiffs allege defendants, as past and present administrators of the Illinois Department of Corrections ("Department") or Stateville Correctional Center ("Stateville"), have violated plaintiffs' rights under the First, Eighth and Fourteenth Amendments to the United States Constitution[3] and under state law. Those alleged violations arise from the living conditions and institutional programs provided to inmates assigned to protective custody at Stateville (Stip. ¶ 1; Cplt.).

2. Department is an Illinois state agency created pursuant to the Unified Code of Corrections ("Code"[4]). Under the terms of and pursuant to the Code, Department is responsible for maintaining and administering all state correctional facilities and institutions, for accepting persons committed to it for care, custody, treatment and rehabilitation, and for developing and maintaining programs of control, rehabilitation and employment for such committed persons (Stip. ¶ 2; Code §§ 1001-1-1, 1003-2-2(a) and (d); PXs 1, 2).

3. Stateville is a maximum security prison located near Joliet, Illinois and administered by Department. It covers an area of 2,200 acres, of which approximately 64 are within its walls. Stateville houses approximately 2,000 inmates within five cellhouses: Cellhouse B, said to be the largest cellblock in the world; Cellhouses E and F, which are panopticons or round cellhouses; and Cellhouses H and I, two new "super-max" cellhouses. Stateville inmates are incarcerated primarily for violent crimes, such as murder and Class X felonies, and are serving sentences up to and including life imprisonment. Stateville has approximately 1,000 staff members, of whom 850 work full time (Stip. ¶ 3; PXs 4-A, 4-B; DeRobertis Tr. 109; O'Leary Tr. 6-7).

4. Protective custody is a status available to a Stateville inmate when he fears for his safety or when the Warden or the Warden's designee believes the inmate's safety may be in jeopardy. Since protective custody at Stateville was created in 1976, the number of inmates with that status has averaged about 200 or 10% of the inmate population, though the precise number varies. At the time of the Trial there were between 260 and 300 inmates in protective custody at Stateville (Stip. ¶¶ 12, 14; Pedersen Dep. 68).

#### B-1. Parties Plaintiff

5. Willie Williams ("Williams") is an inmate who was assigned to protective custody at Stateville from approximately November 1977 until October 13, 1983, when he was transferred to the protective custody unit at Department's Menard Correctional Center in Menard, Illinois. Williams is the representative of the plaintiff class (Williams Tr. 175-78; 96 F.R.D. 383 (N.D. Ill.1982)).

6. Plaintiff class consists of all inmates who have been assigned to protective custody at Stateville at any time since April 30, 1982 or who will be assigned there in the future. It is estimated the total number of class members exceeds 500 (Stip. ¶ 4).[5]

---

Stipulation of Uncontested Facts ("Stip.—"), Trial transcript ("Tr.—"), deposition designations of record ("Dep.—"), exhibits admitted into evidence ("PX—" and "DX—") and pleadings ("Cplt." for the Amended Complaint, and "FPTO" for the Final Pretrial Order).

**3.** Both to conform to customary (though imprecise) usage and to make clear which Fourteenth Amendment guaranty is under discussion from time to time, this opinion will consistently refer to the relevant underlying Bill of Rights provisions rather than to the Fourteenth Amendment,

which incorporates those provisions for application to state actors such as defendants.

**4.** All citations to provisions of the Code (found in Ill.Rev.Stat. ch. 38) will simply take the form "Code § ...."

**5.** Plaintiffs' counsel advise defendants have failed to respond to repeated requests under the discovery Rules to produce an accurate and complete list of class members, with the length of time each has resided in protective custody.

B-2. *Parties Defendant*

7. Michael Lane ("Lane") is Department's Director, a position he has held since 1981. As Director, Lane presides over and supervises Department's total operations. He is responsible for developing, approving and reviewing Department policy and is charged with implementing the statutes and regulations applicable to Department. He regularly performs inspections of the various institutions, has visited Stateville often and is aware of the types of programming available to inmates at the facility (Stip. ¶ 5; Lane Tr. 26–30).

8. Since November 18, 1983 Richard W. DeRobertis ("DeRobertis") has been Department's Assistant Deputy Director for Adult Institutions. As Assistant Deputy Director, DeRobertis is aware of the types of security and custodial measures used and the types of programming available to inmates at Stateville. Before he became Assistant Deputy Director, DeRobertis served at Stateville as Assistant Warden for Programs from June 1979 to February 1980, as Assistant Warden for Operations from February 1980 to March 1981, as Acting Warden from July 1980 to March 1981 and as Warden (also known as Chief Administrative Officer) from March 1, 1981 to November 18, 1983 (Stip. ¶ 6; DeRobertis Tr. 96–98, 103). While DeRobertis was Stateville Warden he directed the overall operations of the institution. DeRobertis' job responsibilities as Warden were controlled by statute and Department regulations and directives. He was responsible for implementing the regulations governing Department and for ensuring that his subordinates did so. He also directed all security and custodial measures and all programming for inmates. DeRobertis' staff reported to him through a regular chain of command, was subject to discipline by him, was subject to his rules and orders and performed all official duties under his authority. Through his frequent visits to the units that housed protective custody inmates and his discussions with those inmates, DeRobertis had knowledge of the conditions in the protective custody units and the programming available to protective custody inmates within those units and the institution generally (Stip. ¶ 6; Code § 1003–1–2; PX 6; DeRobertis Tr. 97–98, 150–52; O'Leary Tr. 6, 88).

9. Michael O'Leary ("O'Leary") has been Stateville Warden since November 19, 1983. O'Leary's responsibilities as Warden have been identical to those formerly held by DeRobertis in that capacity. Between February 1980 and March 1981 O'Leary served at Stateville as Assistant Warden for Programs, and between March 26, 1981 and November 19, 1983 he was Assistant Warden for Operations. In both Assistant Warden positions he was responsible for formulating operating procedures, coordinating resident programs and carrying out the policies, rules and regulations of the institution to ensure the orderly operation of the daily functions of the institution. As Assistant Warden for Operations and as Warden, O'Leary has been principally responsible for security measures within the institution. In all of his Stateville positions O'Leary has made frequent visits to the units that house protective custody inmates, has remained aware of the conditions there and has had knowledge of the programming available to protective custody inmates within those units and the institution generally (Stip. ¶ 7; O'Leary Tr. 6).

10. Salvadore Godinez ("Godinez") has been Stateville Assistant Warden for Operations since November 19, 1983, with responsibilities identical to those formerly held by O'Leary in that capacity. Between April 1981 and November 19, 1983 Godinez was Stateville Assistant Warden for Programs with responsibility for formulating operating procedures, coordinating resident programs and carrying out the policies, rules and regulations of the institution to ensure the orderly operation of the daily functions of the institution. As Assistant Warden for Programs and as Assistant Warden for Operations, Godinez has made frequent visits to the units that house protective custody inmates, has been aware of

---

In any event, the exact size and identity of the class has not yet been determined.

the conditions there and has knowledge of the programming available to protective custody inmates within those units and the institution generally (Stip. ¶ 8).

11. Gayle Franzen ("Franzen") was Department's Director from January 1979 to February 1981. As Director, his duties and responsibilities were identical to those described in Finding 7 for Lane (Stip. ¶ 9).

12. Marvin Reed ("Reed") was Stateville Warden from June 1979 to June 1980. As Warden his duties and responsibilities were identical to those described in Finding 8 for DeRobertis when he was Warden (Stip. ¶ 10).

13. Lou Brewer ("Brewer") was Stateville Warden from September 1978 through June 1979. As Warden his duties and responsibilities were identical to those described in Finding 8 for DeRobertis when he was Warden (Stip. ¶ 11).

### C. *Protective Custody*

14. In 1976 Department adopted Administrative Regulation ("A.R.") 808. A.R. 808 provided for the creation of a protective custody unit in each maximum security facility operated by Department. As established by A.R. 808, protective custody is not an assignment made for disciplinary reasons or because an inmate is regarded as a threat to institutional security. Instead, an inmate is assigned to protective custody either because he believes and the Warden or the Warden's designee confirms, or because the Warden or the Warden's designee believes, protective custody is necessary for the inmate's safety (PX 1-808).

15. Under either method for protective custody placement, defendants are obligated to determine within 10 days of protective custody assignment whether an inmate's protective custody needs are substantiated. If defendants determine the inmate needs protective custody, the inmate is permitted to remain in protective custody as long as the need exists. Between 1979 and 1984 defendants were required to conduct semiannual reviews of an inmate's need for continued protective custody status. More recently those reviews have been scheduled every 30 days (Stip. ¶ 12; PXs 1-808, 2-501D; O'Leary Tr. 34; Pedersen Tr. 233-34; Wheaton 1/29/86 Tr. 154-58).

16. If an inmate's protective custody needs are not substantiated, defendants are supposed to have the inmate removed from protective custody. Inmates are permitted to grieve such orders and to remain in protective custody during the pendency of such grievances. Any inmate assigned to protective custody at his own request is allowed to sign out at any time (Stip. ¶ 12; O'Leary Tr. 24).

17. It is true most protective-custody placements initially result from an inmate's self-designation. But because no inmate is authorized to remain in protective custody unless defendants have substantiated the existence of an identifiable threat to the inmate's safety in the general population, and because on the other hand an inmate's signout subjects him to the risk of such threats if they exist, protective custody status is not truly "voluntary." And although most stays in protective custody are short-term, the length of time that an inmate spends in protective custody is often long-term (and on occasion can last the entire term of the inmate's sentence). Defendants' approach to the handling of protective custody inmates cannot be rationalized on the basis that protective custody status is "temporary" (Flowers Tr. 4-5; Huff Tr. 209-10; Pedersen Tr. 240, 251-52; Williams Tr. 177-78).

18. Since the creation of protective custody status at Stateville, the unit has been located in three different cellhouses. Until January 1, 1979 all protective custody residents at Stateville were assigned to Cellhouse E. No inmates of any other classification were assigned to Cellhouse E at that time (DeRobertis Tr. 100-01; Williams Tr. 179).

19. In early 1979 defendants locked down Stateville and completely reorganized the inmate population. As part of that reorganization, all protective custody in-

mates were moved to Cellhouse B–West, then known as "Death Valley" because the disciplinary segregation inmates were housed there. Disciplinary-segregation inmates are those who have been found guilty of serious and often repeated violations of prison rules and are generally considered behavioral problems posing security concerns to the institution and other inmates (Stip. ¶¶ 14, 15; Lane Tr. 18–19; DeRobertis Tr. 104; Williams Tr. 189).

20. Some few protective custody inmates were later assigned to a gallery in Cellhouse B–East. Otherwise, both protective custody and disciplinary segregation inmates remained housed in Cellhouse B–West (though separated from each other there) until April 1982. At that time defendants moved the disciplinary segregation inmates to Cellhouse F and replaced them in Cellhouse B–West with general population inmates (Wheaton 1/30/86 Tr. 53–55; Stip. ¶¶ 14, 15).

21. In January 1985 defendants moved all protective custody inmates to Cellhouse H, which had previously housed general population and orientation inmates. Defendants first permitted some general population inmates to remain in Cellhouse H to serve as cellhouse help, but later they limited Cellhouse H solely to protective custody inmates (O'Leary Tr. 73; Thomas Tr. 104; Wheaton 10/30/85 Dep. 49–50; Wheaton 1/30/86 Tr. 59–60).

22. Between 1979 and 1982 defendants made no special housing arrangements within Cellhouse B–West for either (a) inmates who had requested protective custody, but for whom defendants had yet to substantiate the need for protective custody status, or (b) for inmates who had been determined by defendants not to need protective custody, but who remained in the protective custody unit pending resolution of their grievances challenging that determination. In 1982 defendants created an investigative section in protective custody for inmates in those two classes. Currently those two classes of inmates are also placed in specially designated areas within Cellhouse H (Flowers Tr. 7–8; O'Leary Tr.

23–25; Pedersen Tr. 239; Wheaton 1/29/86 Tr. 170–73).

### D. *Defendants' Job Responsibilities*

23. Defendants administer Stateville pursuant to the United States Constitution, governing state statutes, applicable court decrees and Department regulations, rules and directives. At a minimum, defendants perform their jobs within the guidelines set by the First, Eighth and Fourteenth Amendments. Under the Code, defendants are responsible for implementing Department's goals, in part through the adoption of appropriate regulations (Code §§ 1003–1–1 et seq.).

24. Department regulations provide specific directives as to the conditions and programs to be provided to all inmates. As adopted in 1976, A.R. 808 provided "[h]ousing and programmatic accommodations [for protective custody inmates] shall be comparable to those provided to the general population." Programmatic accommodations comprise the full spectrum of programs and services provided to general population inmates, thus covering far more than essential services (PX 1–808; O'Leary Tr. 90–94).

25. In July 1981 defendants entered into a consent decree in *Meeks v. Lane,* 75 C 96 (N.D.Ill.) (the *"Meeks* Decree"), containing numerous provisions relating to the living conditions and programs to be made available to protective custody inmates. Implementation of those provisions was required to be completed no later than July 1984 (DX 3). Among the provisions of the *Meeks* Decree:

(a) Several provisions relate to inmates who "are not likely to behave in a manner so as to threaten or intimidate other residents" and who require special protection because of "their age, size, nature of crime, prior testimony [or] gang involvement." Stateville's protective custody unit includes such inmates, and they are class members here. Under the *Meeks* Decree, such inmates "shall have the same opportunities as other inmates in other housing areas of the general

population for ... job assignments, vocational and educational assignments, recreation, access to prison libraries, access to religious services and to all other institutional programs" (DX 3; O'Leary Tr. 104–05).

(b) Various provisions concern programs and conditions for all protective custody inmates generally, compelling: "educational opportunities commensurate with those available to inmates in the general population"; the availability of living conditions, including showers and laundry, "on an equal basis" with the general population; a "plan" to be implemented by June 1984 to provide jobs for protective custody inmates; and a good faith attempt to locate an area suitable for communal dining for protective custody inmates (in the latter respect the *Meeks* Decree specifies "[i]f any new facilities are constructed at Stateville, the Department will consider using them for protective custody dining") (DX 3).

26. To allow for implementation of the *Meeks* Decree, Department promulgated a revised A.R. 808 on an emergency basis. Revised A.R. 808 (now Rule 501.310) altered the regulation to state "[h]ousing accommodations and essential services shall be comparable to those provided for the general population." Although the altered language embraced less than the language of original A.R. 808, revised A.R. 808 is meant to be read together with the requirements of the *Meeks* Decree (PXs 1–808A, 2–501.310, 89, 90, 91; O'Leary Tr. 96–103).

6. Of course the *circumstances* under which "comparable" provisions may be made for protective custody inmates may well differ from those in which corresponding provisions are made for the general population, because of special demands for security inherent in the very nature of protective custody. In that respect, to draw a contrast to another area of the law of equal protection, it may be wholly appropriate to afford protective custody inmates "separate but equal" conditions. Indeed "comparable" provisions may be something less than "equal" in absolute terms where bona fide security considerations so require. But that does

## II. Comparison of General Population Programs and Conditions with Those for Protective Custody Inmates

27. "Comparable," as used in A.R. 808, means "equivalent" or "equal in value or extent." [6] In fact, however, neither the housing or programmatic accommodations nor the essential services provided the protective custody inmates were truly comparable to those offered the general population despite the mandate of A.R. 808. Protective custody programs also were not the "same" as general population programs, though in some instances that is a requirement of the *Meeks* Decree. Nor were they "equivalent" or "equal" in other cases where the *Meeks* Decree specifies they must be (*Webster's Third International Dictionary;* DX 3; Huff Tr. 215–16; O'Leary Tr. 107–09).

### A. Religion

28. Under the First Amendment all persons, including prison inmates, are guaranteed the right to the free exercise of religion (though inmates' rights may be restricted to the extent prison rules are "reasonably adapted" to the legitimate goals of institutional security). Illinois' Code requires defendants to permit "religious ministrations and sacraments" to be available to every inmate at Stateville. Since October 1976 A.R. 839 (now Rule 425) has expressed Department's policy "to provide resources with which residents may expand their knowledge, understanding and commitment to the religious faith of their choice" and "to provide religious activities for all residents" (Code § 1003–7–1(g); PXs 1–839, 2–425; Ledford 1/28/86 Tr. 19–20).

not give defendants the license to substitute shibboleth for reasoned policy—to label every difference in treatment of protective custody inmates as justified by "security" considerations, when in fact major portions of those differences have no demonstrated justification in such considerations at all. As later Findings and Conclusions reflect, defendants' testimony sought impermissibly to attach the magic label of "security" to every instance of their conduct, thereby papering over their own administrative inertia, and simultaneously serving their own desire to avoid administrative inconvenience.

29. Communal religious worship, religious instruction and religious counseling are essential aspects of many individuals' exercise of religion. Those aspects are critical elements of all major religious traditions, particularly the "ministrations and sacraments" that Illinois law requires defendants to make available to every inmate. For many inmates, such religious programs and services provide (or have a substantial potential for providing) vital contributions to health, safety and welfare, a help to moral and ethical conduct and assistance toward rehabilitation. Another important part of the free exercise of religion is an adequate setting for religious programming, offering symbols and a sense of sanctuary (Ledford 1/28/86 Tr. 25–26, 29–31, 49; Ledford 2/6/86 Tr. 50; Yerkes Tr. I 129, 131–39; Yerkes Tr. II 5, 9–13).

30. Defendants have provided Stateville's general population inmates the opportunity for free exercise of religion through numerous programs, including communal worship services, classroom religious instruction and private religious counseling. Some 13 different denominational communal worship services are made available every week, held in one of the three rooms in the chaplaincy building, which are supplied with religious symbols and in at least one case an organ. Through visiting clergy and staff chaplains, the Chaplaincy Department has stood ready to meet any inmate's bona fide request (including such requests by protective custody inmates) for denominational services (PXs 14, 17A, 23, 83G; Ledford 1/29/86 Tr. 23–24, 34–35, 100–01, 105). Defendants similarly offer the general population a wide variety of different courses in religious instruction, taught either with staff or visiting clergy. Defendants have also brought in a large number of special religious programs for the benefit of the general population (PXs 14, 16, 17B; Thomas Tr. 96).

31. Before May 1979, while protective custody inmates were in Cellhouse E, they were afforded opportunities for the free exercise of religion essentially equivalent to those afforded the general population. Protective custody inmates were able to participate in weekly denominational communal worship services, and Bible classes were offered in the cellhouse "dayroom" (Williams Tr. 185). Since May 1979 the access to, and the settings for, all aspects of religious programming for protective custody inmates have been significantly and needlessly inferior to those offered the general population. Those deficiencies, summarized in the following Findings, have denied plaintiffs the opportunity for their meaningful free exercise of religion (PX 11; Yerkes Tr. I 120–23, 127–29; Yerkes Tr. II 10–11; Ledford 1/28/86 Tr. 31, 50–53; O'Leary Tr. 108; Huff Tr. 215–16; Wells Tr. 36–37).

32. When they moved the protective custody unit to Cellhouse B–West in May 1979, defendants stopped all communal worship services and religious instruction for protective custody inmates. Defendants' only "religious programming" (if it may be called that) was to allow the staff clergy to walk the galleries of the protective custody unit. On DeRobertis' orders, visiting clergy were not allowed access to the protective custody unit, thus depriving plaintiffs of access to clergy from several faiths. Because the guards often denied even staff clergy access to the cellhouse, plaintiffs could go several weeks without seeing any clergyman (PX 16; Flowers Tr. 20–26, 41–42; Godinez Dep. 97; Ledford 1/28/86 Tr. 42–43, 94; Ledford 2/6/86 Tr. 50–52; Thomas Tr. 98–99; Williams Tr. 195–96).

33. That absence of religious programs for protective custody inmates was a continuing concern to the Chaplaincy Department, which considered existing conditions deplorable. Yet defendants did not even consider reinstituting communal worship services for protective custody inmates until after April 1982, under the compulsion of the *Meeks* Decree and the pressure of this lawsuit (PX 15; Ledford 1/28/86 Tr. 55–56, 63–65, 90; DeRobertis Tr. 187–90).

34. In November 1982 a multipurpose room was constructed at the back of Cell-

house B–West. When that room was opened for use in January 1983, defendants allowed a single weekly nondenominational communal worship service for protective custody inmates. Because services were limited to nondenominational worship, defendants did not permit religious symbols to be present. Even so, services were often crowded, and not all protective custody inmates wanting to attend were able to do so because the room was often full. Those services were discontinued sometime in mid–1984 without explanation (Flowers Tr. 22–23; Thomas Tr. 99–100; Yerkes Tr. 129–31).

35. When defendants moved the protective custody unit to Cellhouse H in January 1985, a single weekly nondenominational service was reinstituted. Such services are held in an area of the cellhouse converted from garage use. Because the area has a capacity of 20 to 25 inmates, not all inmates desiring to attend are able to do so (Flowers Tr. 26; Ledford 1/28/86 Tr. 96–99; O'Leary Tr. 85).

36. Defendants have never taken a survey of the denominational preferences of protective custody inmates for religious services, nor have they heeded the professed willingness of the Chaplaincy Department to provide services for even the smallest groups of separate denominations. Instead DeRobertis decided a single nondenominational service was sufficient for the religious needs of protective custody inmates. Then just before the trial of this case, defendants allowed the Chaplaincy Department to offer protective custody inmates a single different denominational service each week.[7] Even now the chaplains have been instructed to deemphasize the denominational aspects of such services, however, and religious symbols are con-

sequently still not present at services (Ledford 1/28/86 Tr. 80–81, 102–04, 129–31; Ledford 1/28/86 Tr. 54–55, 57).

37. Defendants have not allowed protective custody inmates the opportunity to counsel with clergy in private. Even during such sacraments as communion or confession, clergymen have been forced to stand outside the cells while the inmates remained in their cells. Other inmates could usually overhear what was said, which generally proved embarrassing or humiliating to inmates (Flowers Tr. 22–26; Thomas Tr. 99).

38. Finding 37's conditions did not change after construction of the room at the back of Cellhouse B–West (see Finding 34) or after the move to Cellhouse H. Although Cellhouse H contains interview rooms, defendants have not permitted them to be used for private religious counseling. Instead, clergymen must administer sacraments through the "chuck hole" in the solid steel cell doors used in Cellhouse H. Visits by clergymen average once a week, with defendants now making available fewer denominations of clergy than in the past (PX 83C; Flowers Tr. 20–26; Thomas Tr. 101–02; Wheaton 1/30/86 Tr. 162–65).

39. Neither the restrictions imposed by defendants on communal worship services and religious instruction (see Findings 32–36) nor the restrictions they have imposed on religious counseling (see Findings 37–38) are either necessary or reasonably adapted to achieve Stateville's institutional security goals or any other legitimate correctional goals.

### B. *Library*

40. Under the Constitution all prison inmates are guaranteed meaningful access to

---

7. Because only a single service is allowed each week, this revised arrangement (under which the particular services are rotated through a cycle) means a Catholic inmate (say) will be provided a somewhat-Catholic-oriented service only once in (say) eight weeks. If we assume (as we must for First Amendment purposes) the sincerity of religious faith, there is not much to choose between (1) a once-a-week fully homogenized service and (2) a once-in-eight-weeks

opportunity to practice pretty much the religion of one's faith, with the other seven weeks devoted to services tailored to other people's faiths. Neither way meets a meaningful-free-exercise test. It is particularly offensive, absent any legitimate need (see Finding 39), for defendants to determine the validity or importance of others' religious beliefs and needs and the way they should be implemented. Yet that is just what defendants have done.

the courts. Illinois' Code requires every inmate to be given access to a library of legal materials, as well as published materials, including newspapers and magazines. To meet those requirements, defendants have established in a secure, separate building at Stateville a general and law library with a capacity of approximately 75 to 100 inmates (Code §§ 1003–7–2(a); Johnson Tr. 35, 62–63).

41. Stateville's library has been available to general population inmates Monday through Friday for morning, afternoon and evening sessions. Each cellhouse of general population inmates is scheduled to have access to the library one day per week. That arrangement calls for only weekday use, so the library is closed most weekends (Stip. ¶ 23; PX 8A; Johnson Tr. 60–61, 63; Morris Dep. 42).

42. All Stateville's library services and programs have been made fully available to general population inmates. That includes full access to the general and law library collections. General population inmates may browse, do their own research and work together on legal projects. Browsing is the way most inmates select books. Tables and chairs are provided, allowing general population inmates to read and study either separately or together. Stateville's library has an audiovisual room, which contains films, videotapes, records, video equipment and record players for both entertainment and education (Stip. ¶ 23; PX 73; Johnson Tr. 42, 44–46, 49–50).

43. Stateville's law library also has a legal clinic, in which inmate clerks provide legal counseling and such materials as envelopes, paper and typewriters. General population inmates are permitted to have confidential interviews with the Chief Legal Advocate in a converted study cell in the library (Stip. ¶ 23; PX 73; Johnson Tr. 47, 49–54).

44. Stateville's library also offers special programs to the general population approximately once a week. Such programs include legal seminars and paralegal training, awareness workshops, mental health programs and ethnic and cultural programs. Many programs bring in outside speakers and allow participation, such as question and answer sessions (PXs 8, 73; Johnson Tr. 70–74).

45. While protective custody inmates were housed in Cellhouse E before May 1979, their opportunities for meaningful access to the courts were essentially equivalent to those offered to the general population. Inmates went to the library on a day set aside exclusively for protective custody use, enabling them to browse and otherwise take full advantage of all of the resources of both the law and general library (Williams Tr. 186). Since May 1979 the access given protective custody inmates to library services (as described in Findings 46–54) has been significantly inferior to that afforded the general population and has been insufficient to permit meaningful access to the courts (Huff Tr. 215–16; Wells Tr. 37).

46. When any protective custody inmate is now permitted in the library, he must be locked in one of the seven operative security cages. Only one protective custody inmate is permitted in a cage at a time, except where two can demonstrate that they are cellmates, co-litigants or codefendants. Protective custody inmates are never permitted out of the cages to browse, study at tables or use the audio-visual equipment. Instead they must rely on inmates assigned as library clerks to get books and materials for them (Stip. ¶ 24; Johnson Tr. 46–47, 53, 55–56, 63, 84).

47. Until January 1985 defendants limited the library access of protective custody inmates to Monday morning from 8 to 11 a.m. and Monday through Friday afternoons from 12 noon to 4 p.m. Because only seven cages have been available, the number of protective custody inmates afforded any library access is severely restricted. Plaintiffs' requests to go to the library were taken on a first-come, first-served basis (unless an inmate had a verifiable court deadline) and were granted only if space in the cages was available (Stip. ¶ 24; PXs 8A, 75, 76; Johnson Tr. 61, 63; Morris Dep. 44–45). Since January 1985 all Mon-

day morning library access has been eliminated, so protective custody inmates have been scheduled for library use only Monday through Friday afternoons from 12 to 4 p.m. One floor of Cellhouse H (each consists of about 100 inmates) is separately designated for the library each day, and inmates are chosen by the gallery officer on a first-come, first-served basis. If there is not enough room to permit a particular inmate to go on one day, he does not get priority on later days (Pedersen Tr. 243–44; Wheaton 1/30/86 Tr. 80–81).

48. Defendants have never made any lists of legal materials, general library materials or periodicals available to plaintiffs. Because of the locked-cage arrangement, protective custody inmates are entirely dependent on the library's law clerk coming to them, and the clerk designated to assist them with legal matters is the same clerk assigned to help the general population. Plaintiffs have had difficulty obtaining library materials because that law clerk is often busy in helping general population inmates or in performing his other responsibilities. Under the established procedures, the law clerk may not get general library materials for plaintiffs, but must forward any request to a general library clerk (Flowers Tr. 27–28; Johnson Tr. 56, 59; Thomas Tr. 112–13).

49. Defendants have never permitted plaintiffs to have confidential interviews with the Chief Legal Advocate in the privacy of the converted study cell. If a protective custody inmate wants legal counseling, he must discuss his case while the Chief Legal Advocate or law clerk stands outside the bars of the study cage. Defendants have never permitted plaintiffs to attend any special library programs, including legal programs (Flowers Tr. 28; Huff Dep. 52; Johnson Tr. 54–55, 74; Morris Dep. 55–57, 67).

50. Because they are put on display in full view of persons in the library while in the cages, plaintiffs often would not go to the library "to keep from being harassed." Plaintiffs understandably found the experience of being locked in the library cages "dehumanizing" and "humiliating"—they were like animals on display. For those reasons, the cages often remained empty when the more aggressive general population houses were scheduled for the library (Flowers Tr. 28; Johnson Tr. 85, 91; Thomas Tr. 112).

51. Even apart from its humiliating aspects, plaintiffs' access to library and legal materials is inadequate, and they are often unable to make any effective use of legal resources. For example, plaintiff Williams, when attempting to respond in 1981 to a motion to dismiss his complaint in this lawsuit, could not obtain the legal research or materials he requested or get his pleadings typed (Johnson Tr. 59, 88; Williams Tr. 199–202). More generally, as anyone who has done legal research knows, it is essential to have free access to the books to know just which ones you really need. No one—even the most skilled legal scholar—can work effectively by having to designate *in advance* precisely which books (or which pages) are needed, then having those books (or pages) brought to the individual, then designating other books (or pages) as a result of reviewing the first designation, and so on. Even if an inmate were sophisticated and attuned to the nuances of legal meaning, the limitations imposed by defendants would convert the possible work of minutes into a need to spend hours—and, moreover, hours to which no plaintiff could gain access.

52. When plaintiffs were housed in Cellhouse B–West, inmate law clerks were supposed to visit the protective custody galleries periodically to take requests for and deliver certain legal and general materials from the library. Often correctional officers denied the clerks access to the cellhouse. Even when they were admitted, they were not permitted to deliver law books from the library to any inmate cell. Although inmates may receive photostatic copies of law materials, they must pay for the copying if it exceeds 300 pages in a year. All the problems described in Finding 51 applied with equal or greater force

to such arrangements (Stip. ¶ 25; Johnson Tr. 68–69, 88, 93).

53. With the move of plaintiffs to Cellhouse H in January 1985, library carts stopped coming to the unit to provide services. Inmate library clerks may come to the unit, but they do not bring large numbers of books into the unit. That aggravated even further the problems described in Finding 51 (Pedersen Tr. 251; Wheaton 10/30/85 Dep. 87–88).

54. Since May 1979 defendants have never set aside the library for the exclusive use of protective custody inmates. In 1982 the Stateville librarian proposed that the library be opened on weekends for "low profile" inmates, such as those in protective custody. However, the correctional staff library liaison told the librarian to drop the matter, because such weekend library services would require a change in the defendants' "mindset." No weekend library services have been instituted for protective custody inmates (Johnson Tr. 63–66).

### C. Vocational and Educational Programs

55. Illinois' Code specifies that a goal of Department is to "restore offenders to useful citizenship." To meet that objective, defendants are required to provide vocational and educational programs designed to give all inmates the opportunity to attain the achievement level equivalent to the completion of the twelfth grade, to encourage the attainment of higher levels of education and to maintain professional instruction wherever possible (Code §§ 1001–1–2(d) and 1003–6–2(d)).

56. Under A.R. 500 (effective June 1, 1977) and its subsequent revisions, Department's policy is to "provide residents with academic and vocational opportunities ... so that their return to the free society will be enhanced and their prospects for employment increased." Administrative Directive 04.10.101 (effective January 15, 1985) further provides defendants must "ensure that academic and vocational programs are available for inmates to better equip themselves for productive lives" (PXs 1–500, 3–04.10.101; Susner Tr. I 5–7, 12).

57. In keeping with those policies, defendants have made available to Stateville's general population inmates the full spectrum of vocational courses offered by the Education Department. Vocational training teaches inmates job skills, both to qualify them for certain jobs within the institution and to prepare them for legitimate employment upon their release. Vocational classes currently available to general population inmates include barbering, welding, small engine repair, graphic arts and building maintenance, which includes training as a plumber or electrician. All the equipment needed to reach vocational training programs is maintained in the vocational education center (Stip. ¶ 27; PX 8A; Susner Tr. I 74–75, 79–81; DeRobertis Tr. 155–56). Stateville's Education Department also offers a career planning program, which evaluates an inmate's vocational interests and abilities so that he can be assigned to a vocational training program (Susner Tr. I 71–72).

58. In like manner, defendants have made available to Stateville's general population inmates the full spectrum of academic courses offered by the Education Department. Since at least 1979 defendants have made available to general population inmates:

(a) classroom instruction in Adult Basic Education ("ABE") and General Education Development ("GED") on an open-entry, open-exit basis;

(b) classroom instruction programs designed for younger inmates who read below a seventh grade level; and

(c) college level courses leading to degrees of Associate of Arts or Bachelor of Arts.

(Stip. ¶ 26; PXs 8A, 35; Susner Tr. I 16, 18–23, 54; Susner Tr. II 11–15).

59. Defendants hold all classes for general population inmates at the Education Center, which has 17 classrooms. That classroom setting serves a valuable func-

tion and is more conducive to learning than individual study because of the interaction among the class members. Indeed, although some learning can take place under other conditions, a classroom setting may fairly be viewed as "essential" to obtaining an effective education (Susner Tr. I 23, 54; Susner Tr. II 14–15).

60. Since 1979, defendants have paid $15 per month to each general population inmate assigned to educational programs on a full-time basis. Any general population inmate may participate in educational programs on a part-time basis, even if he has a job assignment, and receive the greater pay available for working the job (Susner Tr. I 63–64, 67).

61. Before May 1979, while protective custody inmates were housed in Cellhouse E, the opportunities for academic education were essentially equivalent to those afforded the general population. Each day a "line" of such inmates went to the Educational Center for regular classroom instruction (Stip. ¶ 13; Williams Tr. 186–87). As the following Findings show, since May 1979 the vocational and academic programming available to protective custody inmates has been significantly inferior to that afforded the general population. Although O'Leary purports to list vocational education as his top priority for protective custody inmates, defendants have never offered such programs to plaintiffs. Nor have defendants ever made the career planning program or any college level degree programs available to plaintiffs (PX 11; Huff Tr. 215–16; O'Leary Tr. 137; Susner Tr. I 63, 72–73, 82; Wells Tr. 37).

62. From May 1979 through January 1983 plaintiffs received no classroom instruction of any type. During that period protective custody inmates had access to ABE and GED only by individual cell study, an arrangement under which teachers would occasionally visit the galleries, stand in front of the inmate's cell and answer the inmate's questions on the materials. While disciplinary segregation inmates were housed in Cellhouse B–West, defendants focused academic educational programming on them, not on protective custody inmates. Many protective custody inmates became disenchanted with the system because they quite understandably found they could not use the cell study materials effectively (Susner Tr. I 25–26; Susner Tr. II 31; Thomas Tr. 94).

63. Because he recognized the educational services being provided to plaintiffs were "minimal" and because a large number of the plaintiffs had expressed interest in educational programs, Stateville's education administrator proposed to defendants in May 1982 that the Education Department begin regular classroom instruction for protective custody inmates. However, no classroom instruction was permitted until January 1983, when the room at the back of Cellhouse B–West was opened (see Finding 34) (PX 36; Susner Tr. I 29–31).

64. Beginning in January 1983 defendants permitted classroom GED instruction for plaintiffs. Because the class was limited to 15 inmates, there was a waiting list. In mid–1983 defendants ordered GED classroom instruction discontinued for all inmates and had GED taught by closed-circuit television instead (Susner Tr. I 48–51).

65. In January 1983, solely to satisfy the *Meeks* Decree, defendants permitted a single college level course to be offered to plaintiffs. Since moving the protective custody unit to Cellhouse H in January 1985, however, defendants have offered no college courses to plaintiffs. Defendants have once again permitted plaintiffs GED classroom instruction, with the classes held in the cellhouse's converted garage. As for ABE, even though the Education Department believes it can deal more effectively with such students in a classroom setting and such classroom instruction had been offered since July 1983, in Cellhouse H the offering has been confined to cell study (O'Leary Tr. 41; Susner Tr. I 51–56, 59–61).

66. Until July 1985 defendants paid plaintiffs $10 a month "idle pay," even when they participated in classroom instruction. In the fall of 1985 defendants

finally started to pay plaintiffs educational pay of $15 per month, retroactive to July 1985. Through complaints written by plaintiff Williams and others, defendants had known since at least 1983 that protective custody inmates in educational programs were not being paid the $15 educational pay available to general population inmates in such programs. That difference in treatment—though perhaps not significant in a monetary sense—is all of a piece with defendants' total attitudes toward protective custody inmates, manifested in their testimony in this case (though never acknowledged by defendants): Whatever the source or cause of their mindset, they perceive protective custody inmates as a class entitled to fewer privileges, falsely rationalizing their treatment in terms of "security" considerations (PXs 41, 43; O'Leary Tr. 124–25; Susner Tr. I 67–68).

### D. *Jobs*

67. Illinois' Code requires Department, insofar as possible, to employ inmates at useful work. "Such employment shall equip such persons with marketable skills [and] promote habits of work and responsibility...." In connection with such programs, defendants must maintain "programs of training in various vocations and trades" and must "provide opportunities for training outside working hours" (Code §§ 1001–1–2(d), 1003–6–2(d), 1003–12–1, 1003–12–3).

68. To meet their statutory obligations, defendants have made jobs available to general population inmates as skilled workers, semi-skilled workers, clerical workers and general laborers. Defendants pay from $15 to $45 per month for those jobs, depending on skill levels and length of time on the job. Unassigned inmates receive $10 per month in "idle pay" (Stip. ¶ 30; PXs 3–05.03.103A, 10).

69. Before May 1979, while protective custody inmates were housed in Cellhouse E, they held a variety of jobs (such as gallery workers and cellhouse help) within the cellhouse (PX 50; Wheaton 1/30/86 Tr. 40–43; Williams Tr. 187). As the following Findings Show, since May 1979 the job opportunities for protective custody inmates have been either nonexistent or significantly inferior to those offered to general population inmates (PX 11, Huff Tr. 215–16; Wells Tr. 37).

70. From May 1979 until November 1982 defendants made no jobs available to plaintiffs. Throughout that period plaintiffs received only idle pay of $10 per month. From time to time defendants used plaintiffs to do certain tasks around or near the cellhouse, but those tasks were labeled "voluntary" nonpaying jobs, carrying no pay but only the benefit of a potential award of good time (Stip. ¶ 31; PX 10; Flowers Tr. 30–31; Wheaton 1/30/86 Tr. 145–48; Williams Tr. 204–06).

71. In November 1982 defendants made available to plaintiffs a limited number of jobs as gallery help, food handlers and members of cleaning details on a 90–day rotating basis. Defendants made those jobs available solely because of the *Meeks* Decree (Stip. ¶ 32; DeRobertis Tr. 167; O'Leary Tr. 56, 74–75; Wheaton 1/30/86 Tr. 145; Wheaton 2/5/86 Tr. 139–40).

72. Defendants have never made available to protective custody inmates any jobs in prison industries or such skilled job categories as plumbers or electricians. Plaintiffs have frequently complained to the correctional staff that they want jobs to earn good time, help their chances for parole, earn money and get out of their cells (Flowers Tr. 30; O'Leary Tr. 56; Pedersen Tr. 257; Wheaton 1/30/86 Tr. 154).

73. Despite the mandate of the *Meeks* Decree, none of the defendants has developed any plan to provide jobs to protective custody inmates. Before becoming subjected to the compulsion of the *Meeks* Decree, DeRobertis had done nothing to create job assignments for protective custody inmates because he did not want to take any jobs away from the general population. Defendants even permitted approximately 15 general population inmates formerly housed in Cellhouse H to keep jobs as Cellhouse H help, rather than providing those jobs to the protective custody in-

mates who had been moved there (DeRobertis 11/26/84 Dep. 92, 94; DeRobertis Tr. 175; O'Leary Tr. 110–11; Wheaton 10/30/85 Dep. 49–50).

### E. *Conditions*

74. Because out-of-cell recreation is a basic service critical to inmates' well-being, Illinois' Code requires defendants to provide every inmate with the opportunity to leave his cell for at least one hour each day "unless the chief administrative officer determines that it would be harmful or dangerous to the security or safety of the institution." Other statutory provisions guarantee each inmate (a) at least one shower per week, (b) bedding, soap and towels and (c) a wholesome, nutritious diet at regularly scheduled hours (Code §§ 1003–7–2(a), (c), (d)).

75. General population inmates have access to a wide variety of recreational opportunities. Yard access is regularly available, often twice a day. Stateville's new gymnasium, built in 1979, has two full-sized basketball courts, Universal weight machines, at least one ping-pong table, one pool table and a music room. There is also an auxiliary gym with free weights and boxing equipment. Dayrooms in most general population houses are available for leisure time use and are stocked with weights (Wheaton 1/29/86 Tr. 197, 203; Wheaton 1/30/86 Tr. 5–6).

76. Defendants offer numerous other leisure time activities to general population inmates. In addition to the general library, there are chess and checker tournaments, art shows, movies, sports tournaments and picnics (Flowers Tr. 14–16; Godinez Dep. 107–08).

77. Before May 1979, while protective custody residents were housed in Cellhouse E, they (like general population inmates) had both regular day yard and night yard. They also had regular use of the "old gym" located in the central rotunda area of the institution from 8 p.m. to 10 p.m. twice a week. They were also permitted to play checkers or cards on folding tables in the dayroom when they finished their job assignments for the day (Williams Tr. 182–85). As the following Findings show, since May 1979 the protective custody inmates' opportunities for out-of-cell recreation have been significantly inferior to those offered to general population inmates.

78. While plaintiffs were housed in Cellhouse B–West, they were scheduled for yard privileges once per day, but they were often denied such access, particularly if disciplinary segregation inmates had caused disturbances. At other times weather conditions made it virtually impossible for plaintiffs to go when yard was offered. Plaintiffs did attend movies once a week in the "old gym" portion of the central rotunda area (Flowers Tr. 15–16; Wheaton 1/30/86 Tr. 87–88; Williams Tr. 193–94).

79. Until January 1985 defendants made no indoor alternatives to yard recreation available to plaintiffs. They have never permitted plaintiffs to use either of the two gyms, nor did they generally permit the use of flags (the ground-level area within a cellhouse), galleries or other areas in Cellhouse B for recreation by protective custody inmates. For a short time the then Cellhouse B superintendent allowed recreation at the back end of the flag for the 30–40 protective custody inmates in Cellhouse B–East, but defendants discontinued the program when that superintendent was transferred. No attempt was ever made to renew any similar type of flag area recreation (DeRobertis Tr. 177–78, 198; O'Leary Tr. 112–14, 117, 143–45; Wheaton 1/30/86 Tr. 6, 83–84).

80. Since the unit was moved to Cellhouse H in January 1985, protective custody inmates have received about 1¼ hours of dayroom or yard access on alternate days. Defendants provide no recreation on Sundays, though there are no security constraints preventing it. Cellhouse H's yard is smaller and allows for fewer activities than the yard in Cellhouse B, and defendants continue to make the gym and all other recreational programs unavailable to protective custody inmates (Pedersen Tr.

264; Wheaton 1/30/86 Tr. 84–85; Wheaton 2/5/86 Tr. 118–19).

81. Before May 1979, while housed in Cellhouse E, protective custody inmates ate in one of the dining rooms in the central rotunda area, as did the general population. Access to the dining area was through the Cellhouse E tunnel, then across the rotunda corridor to a doorway into the dining room directly facing the tunnel. Security could be provided by sealing off the rotunda corridor by remote-controlled security gates monitored by television cameras and by guards posted in the area (Wheaton 1/29/86 Tr. 195–96; Williams Tr. 180–82). As the following Findings show, since May 1979 the food service for protective custody inmates has been significantly inferior to that afforded general population inmates.

82. Since May 1979 defendants have forced protective custody inmates to eat all meals in their cells except on two occasions—once when such inmates were fed in the central rotunda "old gym" and once on a Thanksgiving when, solely for administrative convenience, such inmates were allowed into the dining hall to get food to take back to their cells. As for the "old gym," it had tables and chairs already set up and, in fact, was used to feed general population inmates during renovation of the existing dining rooms in 1984–85. Access to the "old gym" was directly across the rotunda corridor from the Cellhouse B tunnel. As they did when protective custody residents went to the movies there, defendants were able to provide both access and security in the same way they did so for the dining hall in the same rotunda during the period protective custody inmates were in Cellhouse E (DeRobertis Tr. 132; O'Leary Tr. 50–52, 119–20; Thomas Tr. 107–08; Wheaton 1/30/86 Tr. 135–44; Williams Tr. 191–93).

83. In Cellhouse B and until very recently in Cellhouse H, the delivery of food to protective custody inmates in their cells—given the fact it was prepared elsewhere and had to be transported some distance, with several potentials for delays—frequently caused hot food to be served

cold or in an otherwise unpalatable condition. Despite their early recognition of that obvious problem, defendants did little to correct it. Finally, in November 1985 they procured heated food carts to deliver food to protective custody inmates. Such carts had long been available, but defendants had rejected their use. Though such use did pose some logistics problems, this was still another instance of defendants' discriminatory frame of reference as to protective custody inmates (see Finding 66) (PXs 54–72; Flowers Tr. 19–20; Morrison Dep. 23, 34, 102, 110; O'Leary Tr. 118; Thomas Tr. 108–09; Wheaton 1/30/86 Tr. 117–21; Williams Tr. 191–92).

84. Before May 1979, while protective custody inmates were housed in Cellhouse E, they received showers four to five times a week, particularly after yard or the completion of a job assignment. Defendants converted cells at the end of several galleries for individual showers. Group showers were also located in the basement area. Laundry was picked up once a week (Williams Tr. 179–80, 185).

85. Between May 1979 (when the protective custody unit was moved to Cellhouse B–West) and January 1985 (when the unit was moved to Cellhouse H), the shower and laundry services to protective custody inmates were erratic and less frequent than described in Finding 83 for the pre-May 1979 period (Stip. ¶ 36; Flowers Tr. 8–10, 16–19; Williams Tr. 191, 194–95, 212). Since the move to Cellhouse H, though, daily showers and weekly laundry services have been available to plaintiffs. There have been periods, however, when there was no hot water (Thomas Tr. 111; Wheaton 2/5/86 Tr. 120).

III. *Security Concerns*

A. *General Security Problems of a Maximum Security Institution*

86. As a maximum security prison housing inmates drawn from among the worst offenders in Illinois, Stateville presents understandable security concerns. Confinement in a tightly-controlled institution can

increase tension and thus the danger of violent behavior. There are a large number of mutually hostile gangs in the institution, with gang affiliation running as high as 85% (DeRobertis Tr. 109–10; O'Leary Tr. 9–10).

87. General population prisoners face a day-to-day threat to their safety—usually incapable of being identified and particularized in advance—simply from being incarcerated at Stateville. Using the principles of modern penology, defendants have employed a wide range of means for dealing with that inherent threat. First and most obviously, there are ever-present direct security measures, including the guards, restraint systems and "shake-down" searches. Second, there is prison intelligence, accumulated primarily through informants. Third, there are institutional management techniques, such as specified periods for inmate movement, a pass system and, particularly after the afternoon count, strict controls on all inmate movement (O'Leary Tr. 61–62, 78–79, 81; Wheaton 2/5/86 Tr. 183).

88. All the techniques referred to in Finding 87 help minimize, but cannot eliminate, the generalized threat to general population inmates. Inmates and staff must live with the dangers within the institution on a daily basis. Defendants cannot stop individual acts of violence. They can only institute reasonable and prudent procedures to contain violence and the threat of violence. Although general lockdowns would reduce inmate-to-inmate contact and thus eliminate some of the danger, defendants have opted not to lock down the institution except when absolutely necessary to respond to a specific disturbance within the institution or when a general search is called for (DeRobertis Tr. 205–06; O'Leary Tr. 81–82).

89. One reason for not locking down Stateville more frequently is that severe restrictions on inmate movement and activity are likely to be counterproductive and self-perpetuating. Defendants have therefore recognized that while the extreme measure of lockdown is always available, it is highly undesirable. Idleness and isolation tend to create inmate tension and a concentration of violence during the times inmates are together. Just as security is necessary for successful programming, programming is necessary for security (Godinez Dep. 107; O'Leary Tr. 62, 65–66, 82–83; Wells Tr. 81).

B. *General and Special Security Problems of Protective Custody Inmates*

90. Once incarcerated at Stateville, inmates who are ultimately assigned to protective custody must continue to face a general unidentified threat to their security (that is, one usually incapable of being particularized and identified *in advance*), just as general population inmates do. Even though isolated from the general population, protective custody inmates may still face a general unidentified threat from other protective custody inmates. Protective custody inmates fight, as do general population inmates, and may be subjected to the additional security techniques applied to the general population, such as confinement in disciplinary segregation. Protective custody is not a guaranty that an inmate will be insulated from the general dangers of life in a maximum security prison (Wells Tr. 61, 69).

91. Protective custody is not intended to eliminate the generalized threats that apply to all inmates equally, but rather to protect protective custody inmates from a second level of danger, which is the reason for their placement in protective custody. Unlike the generalized unidentifiable threat, the second level of danger has been identified or is identifiable and specifically substantiated. Defendants know what the danger is. It is from that danger only that plaintiffs have a right to expect additional protection beyond that afforded general population inmates (O'Leary Tr. 79–81).

92. Additional security measures are necessary to safeguard plaintiffs from the second-level threat. Because that level of danger ordinarily comes from the general population, the bulk of the concerns can be addressed by limiting protective custody

inmates' interaction with the general population. At times, the source of the identified danger may be from an inmate who is himself at risk and thus also housed within protective custody. In such cases, defendants must use institutional management techniques to keep the inmates separated (Wells Tr. 66).

93. Except for the need for added techniques to deal with the special problems referred to in Finding 92, the techniques defendants use in the case of general population inmates, to address the generalized threat applicable to all Stateville inmates, can and do work with protective custody inmates as well. When protective custody inmates were housed in Cellhouse E, for example, security was stringent. Protective custody residents did not feel threatened by the general population or by other protective custody inmates when participating in the various activities in groups. Although defendants regarded Cellhouse E as a relatively unsafe house, there is no record of any significant incidents or of gang violence in that cellhouse. And that was so in an institution that defendants otherwise characterized as "up for grabs" and "not in control" in 1979 (DeRobertis Tr. 104–05; Lane Tr. 51; Williams Tr. 187–89).

### C. *Defendants' Professed Concerns with, and Exaggerated Responses to, the Special Security Problems of Protective Custody Inmates*

94. As various previous Findings have indicated and as later Findings will reflect as well, every administrative step defendants have taken or failed to take in providing housing and programmatic accommodations for protective custody inmates has been sought to be explained by them during the Trial as security-motivated and security-oriented. Those rote explanations have been so all-embracing and Pavlovian in nature as to make it difficult for this Court to determine (a) in which instances (limited at best) they represent defendants' credible and actual reasons for action or inaction, (b) in which instances they may

have initially represented defendants' actual reasons for action or inaction, but were shortly thereafter overtaken by defendants' substitution of inertia—unwillingness to change—for the required thoughtful and reasoned response to the rights and needs of protective custody inmates and (c) in which instances they have not been credible or bona fide from the outset—they simply mask defendants' post-hoc rationalizations for courses of action or inaction that were simply easier to follow, less trouble and not at all truly responsive to security needs and concerns. Regrettably this Court finds categories (b) and (c) far outnumber category (a). DeRobertis and O'Leary have been particularly lacking in credibility in explaining their decisions in "security" terms and in not facing up to the need to change policies and procedures.

95. With the move of the protective custody unit to Cellhouse B–West, defendants essentially abandoned their focus on the identified and identifiable threats to protective custody inmates. Defendants have concentrated instead on the general concerns they have decided they can live with in the case of the general population. Defendants have chosen to treat protective custody inmates with the same extreme security procedures they applied to disciplinary segregation inmates, who generally spend at least 23 hours per day in their cells. That policy and its initial implementation caused a dramatic deterioration of conditions and the elimination of most programming for protective custody inmates, and any later improvements in those respects have been wholly inadequate (PX 11; DeRobertis Tr. 107; Williams Tr. 189). In acting as they have, defendants reacted in precisely the manner they have rejected and found unacceptable in dealing with general population inmates. Instead of accommodating themselves to the realities of institutional life, defendants have severely restricted plaintiffs' movement and access to programs in a manner that, in the case of general population inmates, defendants have concluded is counterproductive and highly undesirable (Wells Tr. 37, 81–83; Godinez Dep. 107).

96. Indeed, by applying their restrictive measures inconsistently, defendants have themselves demonstrated such extreme measures were neither appropriate nor necessary to address the second-level threat applicable to protective custody inmates. Thus defendants refused to allow such inmates to participate as a group in some programs, while in others they were willing to do so. Nor was there any logic to their decisions to do so or not to do so (O'Leary Tr. 131–33; Wheaton 2/5/86 Tr. 128). For example (simply by way of illustration and not as an effort to be exhaustive):

(a) Defendants refuse to allow plaintiffs to go to the library as a group at a time dedicated solely for protective custody use. Nevertheless, defendants did allow as many as 60 protective custody inmates at a time to go to yard while they were housed in Cellhouse B–West. Particularly given the nature of yard activity, it clearly was not more dangerous to allow plaintiffs to go to yard together than it would be for them to go to the library together (Flowers Tr. 37; O'Leary Tr. 83; Thomas Tr. 148–49; Wheaton 2/5/86 Tr. 128–29).

(b) During an extended period after protective custody inmates moved from Cellhouse E to Cellhouse B, defendants continued to allow "a fairly large number" of them to go to movies once a week in the "old gym" in the central rotunda area. On those occasions they sat in a darkened room. In certain instances, they were even mingled with general population inmates from the orientation unit. No special security measures were taken. Nevertheless, defendants refused to take plaintiffs to eat communally in well-lighted dining areas adjacent to the "old gym" or in the "old gym" itself. It was not more dangerous to feed plaintiffs in the "old gym" than it was to bring them to the movies (DeRobertis Tr. 196–97, 202–03; O'Leary Tr. 119–21; Wheaton 1/30/86 Tr. 76, 135–39).

(c) Even today defendants allow the protective custody inmates within each wing of Cellhouse H to exercise and use the dayrooms together. Yet if a meal arrives while they are in the dayroom, the inmates are ordinarily required to go to their cells to eat and are permitted to return to the dayroom only when the meal is finished. It is clearly not more dangerous for those inmates to eat together in the dayroom than it is for them to exercise together there (O'Leary Tr. 50–51; Wheaton 1/29/86 Tr. 202–03).

97. When the matter is viewed in terms of the particularized concerns that are the raison d'etre of protective custody status (as contrasted with the more generalized threat that all Stateville inmates must face), the inferior conditions and programming that defendants have imposed upon protective custody inmates cannot be justified in the terms by which defendants have sought to mask their real bases for decision (see Finding 94). Later Findings are merely illustrative of options defendants appeared to have, but never sought to exercise, for providing programs in a manner consistent with meeting the legitimate safety concerns of Stateville and its protective custody inmates, while still providing them with conditions and programs comparable to those afforded the general population. Many of those options clearly presented little or no security concerns of their own. In many cases, however, defendants failed even to consider possible options or rejected them for reasons having nothing to do with security. Moreover, defendants time and again demonstrated the ability to overcome security and operational concerns when they chose to do so.

98. In summary, in light of the preceding Findings, it is clear the inferior access of plaintiffs to religious programs and the law library, and the substantial disparity in conditions and programs for protective custody inmates compared with those for the general population, stemmed not from defendants' misperception of the purpose of protective custody, but rather from a lack of desire or concern, or from affirmative neglect, on the part of defendants.

D. *Programming Alternatives for Protective Custody Inmates*

99. It is not this Court's function to assume responsibility for managing State-

ville. That remains defendants' duty. Most particularly, the choice of means for affording protective custody inmates the constitutional rights to which they are entitled—religious freedom, access to the courts, due process of law and equal protection of the laws—is for defendants to make. It is thus possible some of the potential alternatives identified in later Findings might have been unavailable because of legitimate security concerns, or other proper institutional concerns, if defendants had been exercising their discretion properly, rather than in the manner described (for example) in Findings 94 and 98. Accordingly, the following Findings reflect alternatives that appear to have been available to defendants, and are not a conclusive determination of such availability.

100. It appears defendants had several available alternatives that could have provided comparable conditions and programming to plaintiffs without jeopardizing the security concerns properly applied to protective custody inmates:

(a) Thus it seems defendants could have provided programming to plaintiffs in their own cellhouses, where a variety of usable space existed that might well have been converted to activity space (Wells Tr. 42–43, 46, 54–55):

(1) In Cellhouse B–West defendants could have had activity rooms built on the flag, which is over 400 feet long and 16 feet wide. They chose to have structures built there for correctional staff offices (Wells Tr. 41–42; Wheaton 1/30/86 Tr. 9).

(2) Cells could have been converted into activity space (some are currently used for storage and offices). Cell walls could have been knocked down to convert a block of cells into an activity room (Wells Tr. 42, 54).

(3) Cellhouse B–West had a large transit area (approximately 56 × 16), with a secure location off of 7 and 9 galleries where plaintiffs were housed. Cells in the transit room (which for over 20 years have been used only for storage) could have been removed and the transit area easily converted into activity space (Wells Tr. 55; Wheaton 2/5/86 Tr. 173–75).

(4) All the preceding alternatives might perhaps have posed problems (other than defendants' lack of thought or imagination). But the same cannot be said of the fact defendants could have constructed the room in the back of Cellhouse B–West much earlier. It also appears they could have built additional rooms on one or more galleries above the Cellhouse B–West room to provide additional activity rooms. Defendants might have also utilized the space at the back of Cellhouse B–East for protective custody programming (PX 87; Wells Tr. 42–43).

(5) Cellhouse H provides readily apparent opportunities for various activities and communal dining in the 12 dayroom areas and interview rooms (Wells Tr. 46).

(b) Apart from the cellhouses themselves, it would seem correctional staff could escort protective custody inmates to various activity areas. Through the judicious use of scheduling, contact with general population inmates could be prevented or severely restricted during such movement (Wells Tr. 43, 45, 57–58, 65; Wheaton 2/5/86 Tr. 182–83).

(c) As another (though less desirable) alternative, defendants could have considered the selective commingling of protective custody inmates with the least aggressive general population inmates under proper supervision by correctional staff. Such commingling had already been done in certain circumstances, such as at the movies shown in the "old gym" (O'Leary Tr. 119–21; Wells Tr. 115).

101. Alternatives would also appear to have been available to provide adequate (and comparable) religious programming to plaintiffs. For example:

(a) Defendants could have provided additional religious programming in the cellhouse in any of the potential program areas described above. Thus a cell in

Cellhouse B–West, or the interview rooms in Cellhouse H, could have been made available for private counseling with clergy.

(b) Defendants could have escorted plaintiffs to the Chapel after the afternoon count. Fences and gates along the route from Cellhouse B–West to the Chapel could have prevented general population inmates from having access to plaintiffs.

(c) Defendants could have considered commingling plaintiffs with the least aggressive general population inmates at religious services in the Chapel. As long as there was sufficient supervision by correctional staff, there would be no unreasonable threat to the plaintiffs' safety beyond that ordinarily present for Stateville inmates.

(DeRobertis Tr. 190–92; Wells Tr. 43, 47–48, 51, 115; Wheaton 2/5/86 Tr. 180).

102. Alternatives would also appear to have been available to give plaintiffs meaningful (and comparable) access to the law library. Again by way of example:

(a) Protective custody inmates could have been scheduled for the library one day per week (as is done for each of the other cellhouses) or during the weekend when the library was not being used. Because the library could be locked and made secure, general population inmates would not have access to plaintiffs.

(b) Defendants could have considered commingling plaintiffs with the least aggressive general population inmates in the library, with supervision by security staff.

(c) Defendants could have supplemented general library access by setting up a satellite law library in the protective custody cellhouse, using cells, the transit room or the back-end space in Cellhouse B–West or the dayrooms or interview rooms in Cellhouse H. Such a satellite law library would satisfy any security concerns raised in sending a particular protective custody inmate with a larger group to the library. It would also have created opportunities for plaintiffs to have clerk jobs and to obtain paralegal training.

(Johnson Tr. 66, 92; Wells Tr. 60, 64–65, 115).

103. Alternatives also appear to have been available to provide comparable vocational and educational training to plaintiffs. For example, defendants could have made available in the cellhouse educational classes and light vocational training, such as leathercraft, shoe repair, typing, word processing, court reporting or computer programming. Such programs were suggested to DeRobertis by his staff in 1982, but he rejected them without explanation. Such academic and vocational classes could be held in any of the potential program areas in Cellhouse B–West or in the dayrooms in Cellhouse H. Defendants could also have escorted plaintiffs to the educational or vocational center after 3:30 p.m. (PX 52; Wells Tr. 47, 57–58).

104. Alternatives also appear to have been open to defendants in the area of providing comparable job availability to plaintiffs. They can unquestionably hold a variety of jobs in their own cellhouse, such as the cellhouse help jobs not provided to them until after November 1982 (no adequate explanation was given for not providing such jobs earlier). Moreover, cottage-industry-type jobs, such as leathercraft, clothing stenciling, shoe repair, tailoring, book repair and furniture repair could have been offered in the protective custody cellhouse or even in each inmate's cell. Such jobs would also have provided plaintiffs with employment skills upon their release. Plaintiffs could also have been assigned to jobs in prison industries on a shift separate from the general population (PX 52; DeRobertis Tr. 168–71; Wells Tr. 73).

105. Additional out-of-cell recreation would appear to have been available to plaintiffs in alternative ways too. Plaintiffs could be escorted to the gym after 3:30 p.m. Even were that not feasible, out-of-cell recreation could be available in plaintiffs' own cellhouse. In Cellhouse B–West tables and exercise equipment could have been placed on the flag (ping pong

tables are now in a fenced-off portion of the flag at the end of Cellhouse B–East). Defendants could put exercise equipment in the dayrooms in Cellhouse H (Wells Tr. 65, 67).

106. Finally, communal dining for plaintiffs would similarly seem to have been feasible in alternative ways. Plaintiffs could be escorted to the dining room and fed at a time separate from general population inmates. Tunnels from Cellhouse B–West to the dining room could have been locked to prevent the general population's access to protective custody inmates while they are being escorted to the dining room. That was in fact done when plaintiffs were housed in Cellhouse E (DeRobertis Tr. 192; Wells Tr. 68). Alternatively, before renovation of the dining room plaintiffs could have been fed in the "old gym." Plaintiffs could also have been fed on the flag of Cellhouse B–West, either by moving the general population inmates residing on 1 gallery to a different gallery or by subdividing 1 gallery by a fence into protective custody and general population sides. Now that protective custody inmates are housed in Cellhouse H, defendants could feed them in the dayrooms, as they did with orientation inmates when they were housed in Cellhouse H. Cleaning the mealtime debris would provide jobs for plaintiffs (Pederson Tr. 255–57; Wells Tr. 68–69, 71–72).

### E. *Defendants' Makeweight Excuses for Their Inaction*

107. As the following Findings reflect, defendants failed to pursue any of the alternatives apparently available to them to provide comparable conditions and programming to protective custody inmates:

(a) Defendants simply ignored or neglected alternatives that were readily apparent even to nonprofessionals and should have been doubly so to defendants.

(b) Many of the "security" concerns defendants have raised, seeking to explain away alternatives they say they did

consider, are implausible and must be discredited.

(c) In many cases defendants admit their reasons for not pursuing an alternative are not related to security concerns at all.

As before, the ensuing Findings are merely illustrative, not exhaustive.

108. Defendants never gave consideration at any time to rescheduling programs to accommodate protective custody inmates (who, it will be recalled, average 10% of Stateville's total population). Defendants looked only to whether such scheduling might inconvenience general population inmates and never to what balance might be struck between the competing interests of the two groups. For instance, defendants refused to reserve the library on weekends for plaintiffs' exclusive use, simply because general population inmates sometimes use that facility for special programs (DeRobertis Tr. 127; Hall Dep. 37–38; O'Leary Tr. 122–23).

109. Before mid–1982 defendants failed to consider any use of the spaces at the back of Cellhouse B–West or B–East for protective custody programming. They never at any time considered using the transit room for those purposes, even though it was directly off 7 gallery (which housed the protective custody inmates), was secured by three gates and had not been used for anything but storage for twenty years. Indeed, defendants preferred to keep the transit room as it was, simply on the off chance that its cells might someday be used again (DeRobertis Tr. 123, 177–82, 184–85, 198; Wheaton 2/5/86 Tr. 174–76).

110. Defendants similarly never considered use of the Cellhouse B–West flag area for protective custody unit recreation, even though in 1981 the cellhouse superintendent had successfully experimented with a flag recreation program for plaintiffs housed in Cellhouse B–East. Defendants never considered constructing a program room on the flag, nor did they consider converting cells and constructing a room around them, even though they did just

that when they needed additional medical rooms (DeRobertis Tr. 122–23, 176, 183; O'Leary Tr. 116–18; Wheaton 1/30/86 Tr. 11, 87, 92–94, 172–74; Wheaton 2/5/86 Tr. 173–74).

111. Defendants also never considered using other facilities near Cellhouse B for protective custody programming. Thus defendants never considered (a) expanding plaintiffs' use of the "old gym" from once-a-week movies to occasional communal dining or (b) using the old bakery located just at the end of the tunnel from Cellhouse B–West or (c) using the old chapel building (which they developed instead into a general population arts center) (DeRobertis Tr. 194–96; O'Leary Tr. 119–21; Wheaton 1/29/86 Tr. 183–86; Wheaton 2/5/86 Tr. 173).

112. Where defendants say they did consider but then rejected alternatives, the "security" reasons they advanced for such rejection are implausible and unreal—or at least materially exaggerated. That was true of a number of dangers defendants said were necessarily associated with moving plaintiffs in significant numbers:

(a) Thus defendants *did* move significant numbers of protective custody inmates to yard, to the movies, to GED tests and to a regular stress management class held near the administration building. Such movement presented no risks beyond the generalized ones applicable to all inmates at Stateville (DeRobertis Tr. 202–03; Flowers Tr. 16, 45, 50–51; O'Leary Tr. 83; Wheaton 2/5/86 Tr. 128).

(b) Defendants' asserted fears of general population inmates "lurking" in areas where they would be a threat to plaintiffs being moved are also plainly overstated. Defendants offered no reasonable predicate for finding it unreasonably dangerous to move plaintiffs from Cellhouse H to the nearby library facility on weekends. Given defendants' procedures for controlling all inmate movement, there is no reason to expect general population inmates to be in the area between those buildings and no reason

that general population inmates cannot be kept from that area at the relevant times.

(c) In like manner, defendants appear to have exaggerated the security concerns in moving plaintiffs from Cellhouse H to the program areas at the back of the institution late in the day, in the evening or even at night. For example, after 3:30 p.m. there are no valid inmate passes and all general population movement must be supervised. Inmates on evening work details are chosen according to behavioral patterns and overseen by security guards. For a large amount of the time, general population inmates are busy moving between their cellhouses and the dining rooms in the front of the institution for their evening meal, so they are not near or could be kept from these program areas (O'Leary Tr. 16–18; Wells Tr. 48–49; Wheaton 2/5/86 Tr. 182–83). After 9:00 p.m. there is little or no general population inmate movement except for pre-selected and closely supervised work details. Defendants have successfully moved plaintiffs at that time, particularly for their own work details. Such movement has occurred to places as distant from Cellhouse H as the main administration building (O'Leary Tr. 74–75; Wheaton 2/5/86 Tr. 139–40).

(d) Defendants' stated concerns about "blindspots" on some of the routes to be travelled by plaintiffs also appear overstated. Defendants characterize those areas as blindspots because guards in the perimeter towers are screened from observing whether general population inmates may be lurking in them. Guard tower observation, however, is not the only method to secure those areas. Effective use of television monitors, which defendants use elsewhere in the institution, or the stationing of guards would appear to eliminate any such "blindspots" (Wheaton 1/29/86 Tr. 190; Wheaton 2/5/86 Tr. 182).

113. Defendants admitted several available alternatives present no security concerns at all:

(a) No security concerns prevented the establishment of satellite law libraries, the provision of lists of the books in the law library and the general library, or the offering of vocational courses in the cellhouse in the same manner GED classes have been provided.

(b) Although in court defendants claimed to be concerned that a course such as typing may present security problems from the misuse of typewriters, they have always permitted inmates to use typewriters in the library and to have them in their cells.

(c) Security concerns likewise do not prevent denominational religious services.

(DeRobertis Tr. 127–28, 168–72; O'Leary Tr. 46–47, 76–78; Williams Tr. 199–200).

### F. *Implications from Defendants' Own Conduct*

114. Some of defendants' own conduct has belied their professed current reliance on "security concerns." Between 1982 and 1985 defendants made a number of improvements in protective custody conditions in response to the compulsion of the *Meeks* Decree and the pressure of this lawsuit. They expanded religious opportunities, educational opportunities, jobs, showers and indoor recreation. In each instance defendants' solution was one that had long been available to them. Their decisions to make improvements were prompted not by a desire to meet their constitutional and statutory responsibilities, but by the pressure of *Meeks* and this action (DeRobertis Tr. 114, 167, 175, 177, 188–90; Susner Tr. I 55–56; Wheaton 2/5/86 Tr. 136). Further Findings in this section, which in part trace the history of protective custody housing and programming in relation to the history of this action, are both illustrative and confirmatory of that fact.

115. Defendants made their original decision to house protective custody inmates in Cellhouse B–West not for security reasons, but because it was an "easy" way to handle such inmates. During the ensuing three years defendants made very few changes in conditions and provided essen-

tially no programming for protective custody inmates, often citing the presence of the disciplinary segregation inmates in Cellhouse B–West as the reason for their refusal to make improvements (DeRobertis Tr. 106–07; Williams Tr. 210–11).

116. In January 1981 Williams, who had previously sought to obtain relief via letters and grievances, filed this lawsuit pro se. In July 1981 defendants entered into the *Meeks* Decree. Significantly, the *Meeks* Decree did not require full compliance at Stateville until July 1984.

117. Defendants initially moved to dismiss Williams' pro se complaint. This Court appointed counsel from the law firm of Kirkland & Ellis to respond to the pending motion and to consider filing an amended complaint. As part of their initial effort to investigate the case, in February 1982 Williams' counsel secured an order from this Court to inspect the prison. They did so in March 1982. On April 30, 1982 an amended Complaint with class allegations were filed (Initial Cplt.; Orders of 11/24/81 and 2/22/82; Cplt.).

118. Defendants then moved to dismiss the amended Complaint, primarily asserting the *Meeks* Decree mooted this litigation. After this Court denied defendants' dismissal motion, discovery began in earnest, with plaintiffs serving comprehensive document requests and interrogatories on defendants (548 F.Supp. 927 (N.D.Ill.1982); 96 F.R.D. 383 (N.D.Ill.1982)). Defendants responded with uncooperative and dilatory discovery tactics, meanwhile making limited and selected improvements in protective custody conditions and programs in an effort to deflect concerns regarding their compliance with *Meeks* and to moot this action.

119. It was thus not accidental that in April 1982 defendants took an initial step of moving disciplinary segregation inmates out of Cellhouse B–West to Cellhouse F, moving general population inmates into Cellhouse B–West to replace them. Defendants then expanded the shower schedule and laundry services became more reg-

ular. In June 1982 visiting clergy were permitted to visit protective custody inmates for the first time since early 1979 (Stip. ¶ 16; DeRobertis Tr. 139–40).

120. In June 1982 Stateville's Senior Chaplain Reverend Ledford adopted a plan to escort protective custody inmates to the chapel building to attend communal religious services. Reverend Ledford's plan was initially approved by Godinez, but DeRobertis later ordered the Ledford plan rescinded for reasons having nothing to do with security (PX 22; Ledford 1/28/86 Tr. 75–78).

121. Thereafter defendants first began to consider the construction of the multipurpose room in the previously-unused area at the back of Cellhouse B–West. In the summer of 1982 Reverend Ledford submitted a proposal for an amphitheater arrangement involving several tiers of seats rising up from a podium area. Although the Chaplaincy Department had been interested in finding a means of delivering improved programming to the protective custody unit since at least 1979, defendants took no action on the proposal until late fall of 1982 (PX 22; Ledford 1/28/86 Tr. 56–63, 64–70, 75–80, 88–89, 93–95).

122. In November 1982 plaintiff Williams' deposition was noticed. Approximately one week before the deposition date, protective custody residents began to receive hot cereal for the first time. On the day of the deposition Williams received his first job since the protective custody unit was moved to Cellhouse B–West. Shortly thereafter defendants ordered the room constructed in the unused space at the back of Cellhouse B–West—a room that took a very short time to build (Stip. ¶ 17; PX 87; Williams Tr. 205, 213).

123. In January 1983, as the *Meeks* timetable was running and discovery in this lawsuit was accelerating, defendants began using the room at the back of Cellhouse B–West for limited additional programming for protective custody inmates. Only at that point was a single nondenominational religious service started on Tuesday mornings. In addition, a college course in journalism was instituted for protective custody inmates (Stip. ¶¶ 21, 28).

124. Defendants made even the just-described improvements only grudgingly and to the minimum extent they believed necessary to fend off the pressure of the *Meeks* Decree and this lawsuit. For example, the room at the back of Cellhouse B–West suffered from a number of physical problems, including lack of heat in the winter, standing water and poor ventilation. Moreover, in June 1983 defendants completed the construction of new Cellhouse H and demolished Cellhouse C, one of the round cellhouses. Cellhouse H consists of three floors, having 100 cells divided among four quadrants, each quadrant having a dayroom with offices. Cellhouse H is separated from the rest of Stateville by a double perimeter fence, and access can be gained only by passing through a guard post. Although many aspects of the design of Cellhouse H are very well suited for protective custody, no consideration was initially given to housing plaintiffs there. Rather defendants attempted first to house general population and orientation inmates in Cellhouse H. Nor did defendants consider construction of a protective custody dining room, though the *Meeks* Decree required that such an option be considered (PXs 29, 30, 32, 84C; DX 3; O'Leary Tr. 25–26, 36, 73; Wheaton 1/29/86 Tr. 212–14).

125. By the end of 1984 this Court had ordered discovery closed in this case, scheduled the filing of the FPTO and proposed the setting of a trial date. At about the same time the unit superintendent for Cellhouse B suggested moving the protective custody unit to Cellhouse H. In approximately January 1985 O'Leary ordered that all protective custody inmates be moved to Cellhouse H (Stip. ¶ 18; O'Leary Tr. 73; Wheaton 1/30/86 Tr. 59–60).

126. Lane's conduct elsewhere in the state prison system provides a sharp contrast between defendants' ordinary inaction and their ability to make improvements when they have been inclined to do so. Approximately three years ago Lane decided he wanted protective custody inmates at

Menard to have more out-of-cell recreation. Notwithstanding "very sound rational security and operational reasons" presented by the Menard administration against improvement, Lane "brainstormed" with the Menard administration until they concluded a protective custody yard could be built. In Lane's view he "overcame every obstacle" because he "felt it had to be done" (Lane Tr. 66).

127. In summary, while some security concerns at Stateville may in some cases be legitimate in the abstract, defendants' reliance on them in this case to explain their treatment of protective custody inmates has been exaggerated, at times arbitrary and in several instances wholly pretextual. This finding is buttressed by (a) the unwarranted excessive security applied to protective custody inmates, (b) the large number of apparently available alternatives, (c) the failure even to consider certain unquestionably available alternatives, (d) the unjustified concern expressed for security in some cases when it does not exist, (e) the admitted absence of security concerns in many of the apparent alternatives and (f) defendants' demonstrated ability to overcome security and operational concerns when the desire exists. All those factors, along with defendants' demeanor as witnesses, demonstrate that their parroted fallback on "security" at every juncture represents a mindset about protective custody that stems ultimately from a lack of desire or, worse, an affirmative decision to neglect protective custody inmates.

128. This Court discredits defendants' statements to the contrary. It has evaluated the credibility of defendants' "security" claims against the objective facts, taking into account defendants' demeanor on the witness stand. Defendants have repeatedly demonstrated by their words and conduct that they handled protective custody the way they did not because of legitimate security concerns, but rather because they did not care about improving (or even worse, did not want to improve) the conditions and programs available to plaintiffs. In some instances defendants affirmatively decided to keep conditions and programs

for protective custody inmates unattractive in order to dissuade inmates from opting for protective custody status and to prevent the unit from being perceived as a haven within the institution (PX 11; Wells Tr. 81–83).

129. This Court concludes defendants did not approach the issue of protective custody conditions and programming in good faith or reasonably. It finds defendants' asserted justifications so colored by "overwhelming concentration on asserting 'security' at every stage, whether justified or not," that they are "much less than persuasive in terms of whether those were in fact the motivations that were at work in all of the decisions or, more accurately, in the failure to address the issues" (Closing Tr. 76, 92).

## IV. Injury to Plaintiffs

130. Defendants' unjustifiable denial of comparable conditions and programming to plaintiffs has harmed and continues to harm plaintiffs. Since 1979 defendants have continuously presented inmates who need protective custody with a Hobson's choice: Either give up most programming and normal prison conditions as the price of obtaining security from the identified threat that led to the request for protective custody, or give up needed protection from that identified threat as the price of retaining access to the full spectrum of programs and conditions. Forcing such a "no win" election causes mental anguish, pain and suffering (Clanon Tr. II 119–22).

131. When an inmate does choose protective custody because of perceived dangers in the general population, many of the conditions he is then compelled to face are also likely to cause harm. Thus the extended periods of isolation and idleness, the humiliation and harassment experienced in settings such as the library and the sense of having been made a victim by the defendants are all likely to cause at least temporary mental effects. There is even the possibility of an occasional instance in which such effects may be serious enough

to become permanent. However remote that possibility, there is no justification for defendants having created it, and there is equally no justification for defendants having created even such temporary effects (Wettstein Tr. II 158–64).

132. In one respect there is a substantially greater likelihood of permanence of the adverse effects. Although it is generally recognized that an institution cannot itself rehabilitate inmates, it does provide a means for inmates to work toward their own rehabilitation. Because protective custody inmates are not given an opportunity to participate in programs that may assist in their rehabilitation, plaintiffs are less likely to rehabilitate themselves and thus are more likely to suffer the psychological effects of continued failure and despair and the more tangible effects of recidivism (Clanon Tr. II 122, 124, 127; DeRobertis Tr. 154–55; Lane Tr. 61–62; O'Leary Tr. 64, 66; Wettstein Tr. II 161). To particularize that result in relation to the preceding Findings, the absence of comparable religious, educational, vocational, employment and recreational opportunities, as well as the lack of meaningful access to the law library, all create a likelihood of causing mental anguish and long-term effects because of the unavailability of those important factors in an inmate's rehabilitation (Clanon Tr. II 122–24, 127).

133. In purely institutional and practical terms, plaintiffs' inability to participate on a comparable basis in institution programs also directly affect their chances for parole. As revised in October 1985, the Rules of the Prisoner Review Board (the "Board") provide that the factors primarily looked to by the Board when determining whether to grant or deny parole include "institutional adjustment" and an inmate's "parole plan":

(a) "Institutional adjustment" includes a variety of factors relating to institutional programs, including institutional work assignments, good time credits or loss, completion of high school, college or other academic courses of study, completion of training programs designed to provide vocational skills and success with

counseling (PX 82; Longo Tr. 10, 18–19, 21). "Institutional adjustment" is also affected by an inmate's grade status. Factors taken into account in processing requests for grade restorations and security reductions affecting grade status include an inmate's participation in various programs and services such as jobs, school or vocational training (PX 82; Huff Dep. 23–25).

(b) "Parole plans" provide the Board with a narrative description of what inmates plan to do as to living arrangements, employment opportunities, vocational skills and educational plans after being released. In reviewing a parole plan, the Board considers (1) the relationship between the parole plan and any job assignments, educational programs or vocational training the inmate may have participated in while within the institution and (2) comments from an inmate's clergy, teachers, vocational trainers and job supervisors from within the institution, if the inmate has had contacts with such individuals (PX 82; Longo Tr. 19–20). Obviously the Board cannot consider any of the enumerated factors or give a protective custody inmate credit if he does not have the opportunity to participate or have contact with those factors. Although the Board claims not to penalize a protective custody inmate who does not have program participation factors, because such programs were not available to him, the Board is dependent upon supplemental reports prepared by Department on a case-by-case basis to know which programs are available to protective custody inmates. Unless the institutional report describes program availability for a protective custody inmate, the Board cannot determine whether the absence of participation carries a negative or a neutral inference (Longo Tr. 15–16, 21).

134. Finally, defendants' failure to provide plaintiffs with comparable job opportunities has caused plaintiffs damage in the form of lost wages. In view of the known unavailability of jobs to protective custody inmates, there was no need for them to

have *applied* for jobs to trigger a recovery of such damages. Nor is it feasible to require each individual plaintiff to prove the likelihood he would have applied for and received a particular job. Instead the determination and award of damages can most fairly be done on an average basis through application of the following formula:

$$\text{Lost pay} = (\text{Composite Job Monthly Pay} - \text{Monthly Idle Pay}) \times \text{Months in PC Without Job}$$

Under that formula, "composite job monthly pay" represents the average pay range for jobs held by general population inmates in Cellhouse B, weighted according to their availability, and has been calculated as $19.50 per month. Idle pay is, by regulation, $10 per month (PXs 3–05.03.103A, 86; Wells Tr. 75–80).

### Conclusions of Law

1. Plaintiffs advance six independent grounds for imposing liability on defendants for their conduct, unquestionably engaged in under color of state law:

(a) Defendants' denial of plaintiffs' free exercise of religion violates their First Amendment rights.

(b) Defendants' denial to plaintiffs of meaningful access to the courts violates their fundamental Fourteenth Amendment due process rights.

(c) Defendants' conduct (1) in conditioning plaintiffs' rights to safety and security on a forfeiture of other rights and privileges and (2) in subjecting plaintiffs to conditions that of themselves are cruel and unusual, each independently and taken together, violates plaintiffs' Eighth Amendment rights.

(d) Defendants' denial to plaintiffs of comparable opportunities for rehabilitation and parole violates their Fourteenth Amendment rights to due process and equal protection.

(e) Defendants' denial to plaintiffs of housing and programmatic conditions comparable to those offered general population residents violates plaintiffs' Fourteenth Amendment rights to due process and equal protection.

(f) Defendants' denial to plaintiffs (1) of housing and programmatic conditions comparable to those provided to general population residents and (2) of comparable opportunity for rehabilitation and parole each violates Illinois state law.

As the following Conclusions show, all except plaintiffs' Eighth Amendment claims have been sustained.

*Free Exercise of Religion*

2. Since the Trial our Court of Appeals has articulated the relevant free-exercise-of-religion standards in a way that might well have been written for this case, *Caldwell v. Miller,* 790 F.2d 589, 595–96 (7th Cir.1986) (citations and footnote omitted):

Lawful incarceration necessarily brings with it the restriction of many privileges and rights.... The right to the free exercise of religious beliefs, nevertheless, does not abate upon imprisonment.... That right may, of course, be restricted in order to achieve legitimate correctional goals, and to maintain institutional security.... We must, however, carefully scrutinize prison restrictions that affect an inmate's free-exercise rights "to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the corrections system." ... Prison rules that restrain the free exercise of religion are justified only if they are "reasonably adapted" to achieving an important penological objective....

We accord, as we must, prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security, ... and we will not substitute our judgment for theirs "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these con-

siderations." ... This does not mean, however, that it is appropriate for us to defer completely to prison administrators.... By requiring that a prison regulation or policy be reasonably adapted to an important correctional goal, we protect the legitimate interest of prisoners in adhering to their religious beliefs and give guidance to prison administrators in adopting policies that comply with constitutional standards, while at the same time appropriately deferring to their judgment in matters related to institutional security.[8]

3. Communal prayer, religious instruction and private religious counseling are essential parts of the right to the free exercise of religion. Each is central to a meaningful opportunity to practice religious faith. For the reasons demonstrated in the Findings, it must be concluded defendants knowingly and under color of state law unreasonably abridged plaintiffs' right to the free exercise of their religion, as defined in *Caldwell*, by failing to provide protective custody inmates with an opportunity to pray communally, by denying them the opportunity to participate in the rituals of their faith and by depriving them of religious counseling and instruction—all in a manner and to an extent "[un]necessary to effectuate the legitimate policies and goals of the corrections system" and not at all " 'reasonably adapted' to achieving [any] important penological objective." Without question defendants "have exaggerated their response to [purported] considerations" of "internal order and security"—they are really post-hoc rationalizations for their unconstitutional conduct.

### Meaningful Access to the Courts

■ 4. Plaintiffs as inmates have a fundamental constitutional right of access to the courts protected by the Fourteenth Amendment. Such access must be adequate, effective and meaningful. That fundamental right requires defendants to provide plaintiffs with meaningful access to adequate law libraries or adequate assistance from persons trained in the law—or perhaps some alternative means to achieve the same goal. *Bounds v. Smith*, 430 U.S. 817, 821–22, 828, 830, 97 S.Ct. 1491, 1494–95, 1498, 1499, 52 L.Ed.2d 72 (1977); *Corgain v. Miller*, 708 F.2d 1241, 1247–50 (7th Cir.1983).

■ 5. For the reasons demonstrated in the Findings, it must be concluded defendants knowingly and under color of state law unreasonably deprived plaintiffs of meaningful access to the courts by denying them adequate opportunities to use the library and adequate assistance from persons trained in law. In light of the readily available options, defendants' decisions to restrict protective custody inmates to the library cages, to deny them direct access to even a list of law library books, to force them to request relevant materials in advance and to make them rely on inmate clerks not only (a) deprives them of opportunities equivalent to those afforded to general population inmates, who are permitted personal access to the prison library, but also (b) violates the constitutional standard of "meaningful access." Here too the claimed security-oriented considerations are a pretext to cover up defendants' unconstitutional conduct.

### Cruel and Unusual Punishment

■ 6. Under the Eighth Amendment plaintiffs are entitled to be free from cruel and unusual punishment. Inherent in that constitutional guaranty is the right to be free from bodily harm and unreasonable

---

**8.** Though *Caldwell* speaks in terms of religious freedom, its thrust is far more universal. This Court approached the Trial prepared to give defendants the full measure of deference that our Court of Appeals later articulated in the *Caldwell* passage quoted in the text—and to give that deference as to all issues in this case (not only as to religious freedom). These Findings and Conclusions have continued to accord de-

fendants such deference, seeking to avoid any substitution of judgment as to how Stateville should be operated. But by rights defendants really forfeited their right to that deference when their testimony demonstrated a total lack of credibility by attaching the "security" label so indiscriminately and in an unwarranted manner, as detailed in these Findings and Conclusions.

threats to safety and security. Conduct by defendants that reflects a deliberate indifference to that right violates the Eighth Amendment. *Little v. Walker*, 552 F.2d 193, 197 (7th Cir.1977). Nor may the conditions of confinement themselves be cruel and unusual. *Rhodes v. Chapman*, 452 U.S. 337, 345–47, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981); *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978); *Caldwell*, 790 F.2d at 600–01; *Bono v. Saxbe*, 620 F.2d 609, 612–15 (7th Cir.1980).

7. Forcing plaintiffs, in order to obtain the protective custody they are entitled to receive, to forego the housing and programming opportunities they should also be entitled to receive—the Hobson's choice identified in Finding 129—poses a "cruel" dilemma for plaintiffs in the rhetorical sense of the word "cruel." But once plaintiffs have opted for protective custody, the conditions of their confinement (though violative of other constitutional rights, as these Conclusions hold) are not "cruel and unusual" as those Eighth Amendment criteria have been defined by the cases, nor is the forced choice itself "cruel and unusual punishment" under the cases.

*Due Process and Equal Protection*

8. Under the Due Process Clause, plaintiffs are protected against arbitrary and unreasonable deprivations of their liberty or property interests without due process of law. Under the Equal Protection Clause, plaintiffs are protected against arbitrary and unreasonable classifications that affect them substantially and adversely. It is unnecessary here to determine whether defendants' conduct affects fundamental rights, so as not to be upheld unless defendants can demonstrate a compelling state interest, or whether other lesser interests are at stake, so as to prohibit defendants' conduct only if it fails to bear some rational relationship to a legitimate state purpose. See *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*,

418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Bono*, 620 F.2d at 616–17; *Durso v. Rowe*, 579 F.2d 1365, 1372 (7th Cir.1978); *French v. Heyne*, 547 F.2d 994, 997 (7th Cir.1976). As the following Conclusions reflect, defendants fail either test.

9. For the reasons demonstrated in the Findings, it must be concluded defendants knowingly and under color of state law arbitrarily and unreasonably violated and continue to violate plaintiffs' rights under both the Due Process and Equal Protection Clauses:

(a) Plaintiffs have constitutionally protected liberty interests, independent of any provision of state law or regulation, in the free exercise of religion, in meaningful access to the courts and in the noninterference on a wholly arbitrary basis with their opportunities for rehabilitation and parole.

(b) Plaintiffs also have constitutionally protected liberty interests created by the mandate of defendants' own earlier version of A.R. 808 that "[h]ousing and programmatic accommodations [for protective custody inmates] shall be comparable to those provided for the general population." Those liberty interests are not diluted by defendants' more recent change in A.R. 808. Because the new regulation was adopted to implement the *Meeks* Decree, it should properly be construed in conjunction with the *Meeks* Decree. Numerous provisions of that Decree have been and continue to be violated, including (1) the guaranty that conditions and programming for a certain class of protective custody inmates will be "the same" as for general population inmates, (2) the provisions affecting all protective custody inmates that educational and vocational programs shall be "equivalent" or equal in value or extent and (3) the requirement that a job plan must be developed (DX 3).

(c) Defendants have not provided plaintiffs with either a predeprivation or a postdeprivation hearing, or with any other process whatever, in connection

with the deprivation of plaintiffs' rights—their liberty interests—specified in Conclusions 9(a) and 9(b). On the contrary, no plaintiff in protective custody has any power to escape such deprivations: They are irrevocably tied to protective custody status. Defendants cannot constitutionally condition protective custody status—a status predicated on danger to the safety or even life of an inmate—upon the forced surrender of such liberty interests without any process of law.

(d) Both under the Equal Protection Clause and under A.R. 808 (see Conclusion 9(b) ), plaintiffs are entitled to the opportunity for the free exercise of religion, for meaningful access to legal services and the courts, for prison jobs and for educational and vocational programs on a basis equivalent to that afforded all other inmates, except to the extent of a demonstrated rational relationship between any difference in treatment and a legitimate state interest. Defendants' conduct does not bear any such rational relationship to any legitimate state purpose—instead, their purported justification in terms of security concerns is an arbitrary and exaggerated response and masks defendants' real delinquencies. Their conduct is therefore inconsistent with and violative of equal protection standards as well.

*State Law*

10. A.R. 808 and the *Meeks* Decree have the force of state law. Defendants (a) have knowingly failed to provide plaintiffs with housing conditions and programmatic accommodations comparable to those they provide to the general inmate population and (b) have not complied with the provisions of the *Meeks* Decree.[9] Accordingly defendants have violated and are violating plaintiffs' rights under state law.

*Remedies*

11. As a class of inmates who have been or will be assigned to protective custody, plaintiffs have been and continue to be proximately harmed by defendants' violations of the Constitution and state law. Because the stated violations of plaintiffs' First and Fourteenth Amendment rights by definition constitute irreparable harm, plaintiffs are entitled to an injunction against defendants' continuing conduct. *Westchester Legal Services, Inc. v. County of Westchester*, 607 F.Supp. 1379, 1385 (S.D.N.Y.1985); *Lee v. McManus*, 543 F.Supp. 386, 392 (D.Kan.1982); *Northern Penna. Legal Services, Inc. v. County of Lackawanna*, 513 F.Supp. 678, 685 (M.D. Pa.1981) (drawing on *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) ).

12. Even though defendants have altered their conduct in part to provide some improved conditions and programming for plaintiffs, an injunction is appropriate. Defendants made many of those changes only because of the pressure of this case and the compulsion of the *Meeks* Decree. Moreover, the changes that have been made have not been adequately responsive to all defendants' constitutional violations described in the Findings. Injunctive relief is appropriate both for that reason and because it is necessary to provide assurances that defendants will continue to provide such improved conditions and programming as have been established by their altered conduct.

13. Plaintiffs have also established the predicate for an award of compensatory damages. Although no award may be made for defendants' denials of plaintiffs' constitutional rights as such (*Memphis Community School District v. Stachura*, — U.S. —, 106 S.Ct. 2537, 2544–45, 91 L.Ed.2d 249 (1986) ), they are entitled to damages for injuries that can be measured in monetary terms: (a) pain, suffering and

**9.** Following these Findings and Conclusions, this Court invites the parties' input toward the entry of an implementing Order. One subject the parties should address is the extent (if any) to which the Order should enforce the *Meeks* Decree as such—a decree not assigned to this Court's calendar.

mental anguish already suffered and proximately caused by defendants' unlawful actions; (b) pain, suffering and mental anguish reasonably certain to be suffered in the future from the same causes; and (c) back pay (see Finding 134) for lost wages from defendants' failure to provide plaintiffs with opportunities to have jobs or participate in educational or vocational programs, as well as for the impairment of their earning capabilities (*Memphis*, 106 S.Ct. at 2542–43).

 14. Defendants are entitled to qualified immunity from such damage recovery only if their conduct did not violate statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986) ("The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful"). Immunity does not extend to the violation of plaintiffs' rights committed by defendants here. Decisions predating the plaintiff class commencement date of April 30, 1982 had clearly established plaintiffs' constitutional rights, in the context of the prison environment, to the free exercise of religion (*Cruz v. Beto*, 405 U.S. 319, 322 & n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263, (1972) (per curiam)), meaningful access to legal services (*Bounds*, 430 U.S. at 821–22, 828, 97 S.Ct. at 1494–95, 1498; *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974)), due process (*Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974 41 L.Ed.2d 935 (1974)) and equal protection (*Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968)(per curiam); *French*, 547 F.2d at 996–97). And there is nothing unique about the nature of the rights asserted by plaintiffs that would render the *Harlow-Azeez* principles inapplicable.

15. In addition to actual damages, the law permits an award of punitive and exemplary damages to punish egregious violations of constitutional rights and to serve as a warning to others not to engage in such conduct. Such damages are recoverable "if the defendant's conduct involves reckless or callous indifference to the plaintiff's rights, or if the action is motivated by evil intent." *Perry v. Larson*, 794 F.2d 279, 286 (7th Cir.1986), citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Because neither plaintiffs' nor defendants' counsel have focused fully on just which defendants are and which are not liable for such damages and on the amount of such liability, final entry of such award will await further submissions by the parties.

16. As prevailing parties, plaintiffs are entitled to their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

\* \* \*

Counsel for plaintiffs have submitted, as part of their proposed Findings and Conclusions, a proposed form of Order. Because counsel for defendants understandably had not acknowledged liability in their own submission, they had not commented directly on the proper form of an order to that effect. Accordingly on or before November 3, 1986 they are directed to do so (with particular reference to the form of Order previously submitted by plaintiffs' counsel), and both sets of counsel are also directed to address the subject referred to in Conclusion 15.